**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

**CIVIL ACTION NO. 1:13CV-00049-JHM**

**SUNSHINE HEIFERS, LLC** **APPELLANT**

**V.**

**LEE H. PURDY, et al.** **APPELLEES**

# MEMORANDUM OPINION AND ORDER

This matter is before the Court upon an appeal from Bankruptcy Court. The Appellant, Sunshine Heifers, LLC, argues that the Bankruptcy Court erred when it ruled on the status of Sunshine's prepetition agreement with Debtor, the priority of Sunshine's security interest, and the Citizens First Bank's priority in the post-petition milk. Also, Appellant has filed a motion to amend its designation of the record and statement of issues [DN 6]. Fully briefed, this matter is ripe for decision. For the following reasons, the Court **AFFIRMS** the decision of the Bankruptcy Court and the Appellant's motion to amend is **DENIED**.

## I. BACKGROUND

### A. Citizens First Loans

Debtor, Lee H. Purdy (hereinafter "Debtor" or "Purdy"), is a dairy cattle farmer who at the time of the appeal operated his business on property in Barren County, Kentucky. In 2008, Purdy entered into a loan relationship with Citizens First Bank (hereinafter "Citizens First"), pledging as collateral his dairy cattle. The loan was refinanced in 2009. Purdy executed a new Promissory Note and an Agricultural Security Agreement which grants Citizen First a purchase money security interest in all "Chattel Paper, Accounts, Equipment, Farm Products, Livestock (including all increase and supplies) and Farm Equipment currently owned hereafter required . . .

.” including “without limitation any and all offspring, unborn livestock, and other products, previously, contemporaneously and/or in the future acquired by Grantor whether by purchase, exchange, accretion or otherwise . . . .” (July 3, 2009, Security Agreement). On July 6, 2009, Citizens First filed a financing statement with the Kentucky Secretary of State perfecting its security interest. For identification, Citizens First required the cattle to bear white ear tags.

On August 19, 2010, Purdy and Citizens First executed an additional Agricultural Security Agreement in which Purdy granted to Citizens First a security interest in “all crops, farm products and livestock currently owned or hereafter acquired.” The security agreement was perfected by a UCC Financing Statement with the Kentucky Secretary of State on September 1, 2010. Similarly, on May 31, 2012, Purdy executed another Agricultural Security Agreement granting Citizens First a security interest in “All Farm Products.” Citizens First filed a UCC financing statement perfecting its security interests on July 26, 2012.

The record reflects that at the time of the bankruptcy hearing, Purdy had outstanding loans with Citizens First of approximately $455,000 and $153,000, and a $40,000 line of credit. Purdy had one bank account and that was with Citizens First and all business cash from whatever source was deposited in that account.

**B. Sunshine Heifers, LLC Leases**

Subsequent to the first two security agreements with Citizens First, Purdy decided he wanted to increase his herd and met with Jeff Blevins (hereinafter “Blevins”) from Sunshine Heifers, LLC (hereinafter “Sunshine”). Purdy and Sunshine entered into five lease agreements, three of which were still in effect at the time of the bankruptcy filing. In May and June of 2009, Blevins delivered to Purdy 45 cattle which Blevins had recovered from a farm which he had

foreclosed. Purdy paid Blevins with a check from his Citizens First account for this transaction. Three months after the cattle were delivered, Purdy and Sunshine entered into a "Dairy Cow Lease" (Lease 1) and a security agreement. On December 15, 2010, Purdy entered into a "Dairy Cow Lease" (Lease 2) with Sunshine for 240 head of Hostein heifers for a term of 50 months. Danny Layton and Kendall Branstetter purchased the cattle for Purdy. The record reflects that Purdy paid Branstetter for the cattle. Prior to signing the lease, the cattle were on Purdy's farm and were being cared for and milked by Purdy. Upon the signing of the lease, Sunshine wired money to Purdy's account per the instructions of Branstetter. The parties also entered into a security agreement and financing statement covering the 240 cows.

In July of 2011, Linus Kuennen purchased 50 head of cattle for Purdy. The cattle were branded and tagged before delivery to Purdy. On July 22, 2013, Purdy and Sunshine entered into a "Dairy Cow Lease" ("Lease 3") with Sunshine for this 50 head of cattle for a term of 50 months. A security agreement was executed and UCC filing was made in connection with this lease.

On July 14, 2012, Sunshine and Purdy entered into a "Dairy Cow Lease" ("Lease 4") to cover 285 head of cattle. This agreement did not cover any new cattle; it was made to "wrap up" the cattle covered under Lease 1 and 2. Purdy and Sunshine entered into a security agreement and a financing statement was filed in connection with this lease.

Purdy testified that in May of 2012, he asked Blevins if he had built up enough equity in the leases for Debtor to acquire more cattle. Blevins told Purdy he could purchase 100 more head of cattle for $1,500.00. On July 14, 2012, the same day as Lease 4 was signed, Purdy and Sunshine entered into a "Dairy Cow Lease" ("Lease 5") with Sunshine for 100 head of cattle for

a term of 50 months. Kendall Branstetter purchased the cattle from various places and they were delivered to Purdy's farm from June to July of 2012. Purdy paid Branstetter for the cattle. After the cattle were delivered, Sunshine sent a check to Purdy for the money he had paid Branstetter to purchase the cattle. Prior to Sunshine's payment, the cattle had been delivered to Purdy's farm and he was milking and caring for them. The cattle were branded with Sunshine's brand and tagged by Purdy and his employees after they arrived at Purdy's farm. A security agreement was executed and UCC filing was made in connection with this lease.

All of the Sunshine Leases are identical except for the date of entry and number of cattle involved. Only Leases 3, 4, and 5 were still in operation as of the date of the petition. As noted by the Bankruptcy Court, the leases do not permit Purdy to terminate the Lease at will and return the cattle to Blevins or Sunshine. Additionally, the record reflects that while the Leases include a 50-month lease term, the useful life a dairy cow is less than 50 months. The Leases place the risk of loss of the cattle on Purdy. Pursuant to the three "Dairy Cow Leases" (Leases 3-5), Sunshine claims to own 435 cattle.

**C. Purchase and Culling of Cattle**

Purdy purchased other cattle during this time period that had no relationship to a Sunshine lease. In fact, Purdy testified that at one point by mistake all cattle that came into the farm were branded by Purdy's employees with Sunshine brand even though Purdy personally paid for the cows with funds from the Citizens First account. Additionally, the record reflects that periodic culling of approximately 30 percent of the herd per year occurred throughout the lending relationship with Citizens First, meaning that the herd turned over within 3 years. The record reflects that in July of 2012, Purdy's herd reached about 750 head.

All replacement cattle were purchased with proceeds from sales of culled cows and calves and all from funds deposited at Citizens First. Citizens First made regular inspections of Purdy's herd, the last occurring on August 14, 2012. At that time, Purdy had a total of 961 cows on the farm, 320 of which had Sunshine brands and tags. Approximately 150 of the cows were Purdy's landlord's cattle. In the fall of 2012, Purdy began selling cattle at a much higher rate due to his increased costs. Purdy estimated that he sold about 250 head, the majority of which were branded with the Sunshine brand. The funds from the sale of the cattle were deposited in Purdy's Citizens First account.

On November 29, 2012, Purdy filed his Voluntary Petition seeking relief under Chapter 12 of the United States Bankruptcy Code. On December 6, 2012, representatives from Citizens First, Sunshine, and Purdy inspected Purdy's herd. At that inspection, Citizens First representatives determined there were 289 cows with Citizens First white ear tags and the Sunshine brand of SSH, 99 cows with white ear tags and no brand, and one cow that had no brand or ear tag for a total of 389 cows.

**D. Bankruptcy Proceeding**

Following the filing of the Bankruptcy Petition, Citizens First filed a Motion to Prohibit Use of Cash Collateral and Motion for Relief of Stay Regarding Livestock and Farm Equipment. Sunshine filed a Motion to Prohibit Use of Cash Collateral, a Motion to Shorten Time to Assume or Reject Unexpired Leases, and a Motion for Relief of Stay regarding dairy cattle. Several 2004 examinations were conducted, including the examination of many of the third-party purchasers of the cattle. A hearing was conducted on January 22, 2013. Bankruptcy Judge Joan Lloyd characterized the hearing related to these motions as the "lien dispute portion of the case."

(Transcript, DN 21-22 at 21). Counsel for Sunshine participated in the hearing indicating that the central issue is whether Sunshine's lease is in fact a lease. (Id.). Purdy, Blevins, and representatives from Citizens First Bank testified. After the conclusion of the testimony, the Court granted Sunshine five business days to respond to the additional issue of whether Citizens First had a first lien on all the milk, as an identified farm product. (Id. at 174).

Based upon the evidence presented, the Bankruptcy Court ruled in its Memorandum-Opinion dated March 1, 2013, that the Diary Cow Leases of Sunshine Heifers are security interests, not true leases, the prior perfected liens of Citizens First had priority over Sunshine's security interests, and Citizen First's pre-petition lien encumbered post-petition milk proceeds pursuant to 11 U.S.C. § 552(b). Additionally, the Bankruptcy Court denied the motion by Sunshine to extend time to assume or reject unexpired leases and its motion for relief from stay on livestock. Sunshine now appeals the Memorandum-Opinion.

## II. STANDARD OF REVIEW

A federal district court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a). On appeal, a district court reviews the bankruptcy court's finding of fact under a clearly erroneous standard, but reviews *de novo* the bankruptcy court's conclusions of law. Nicholson v. Isaacman (In re Isaacman), 26 F.3d 629, 631 (6th Cir. 1994). A finding of fact is clearly erroneous when "although there is evidence to support the finding, 'the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.'" Kalamazoo River Study Group v. Rockwell Intern. Corp., 274 F.3d 1043, 1047 (6th Cir. 2001) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

## III. DISCUSSION

### A. Rule 7001 Adversary Proceeding

Appellant Sunshine argues that the Bankruptcy Court erred procedurally by determining the priority of liens in violation of Bankruptcy Rule 3012 and Rule 7001. Specifically, Appellant contends, "Creditors and Appellant/Sunshine had no idea prior to the Hearing that this Court would be conducting such a hearing on valuation and would make a decision between two competing claims." (Appellant's Reply Brief on Appeal, DN 45, at 3). Appellees respond by noting that the hearing that decided priority not only arose out of Appellant's motions but also that the Appellant fully participated in the hearing.

Bankruptcy Rule 7001 defines the types of actions that commence an adversary proceeding within a bankruptcy case. Rule 7001(2) classifies "a proceeding to determine the validity, priority, or extent of a lien or other interest in property," to be an adversary proceeding. Fed. R. Bankr. Proc. 7001(2). "Adversary proceedings . . . are subactions which are raised within a 'case' and are commenced by the filing of a complaint." In re Blevins Elec., Inc., 185 B.R. 250, 253 (Bankr. E.D. Tenn. 1995) (citing Fed. R. Bankr. Proc. 7003). "[A] party seeking a court determination as to the validity of a lien must ordinarily commence an adversary proceeding . . . . [but] [w]here a party has proceeded by motion and the record has been adequately developed . . . courts have reached the merits of the dispute despite the procedural irregularity." In re Braniff Intern. Airlines, Inc., 164 B.R. 820, 831 (Bankr. E.D.N.Y. 1994) (citations omitted). In other words, form should give way to substance where the party challenging the proceeding had an adequate opportunity to examine the evidence and argue its points. In re Trico Marine Services, Inc., 450 B.R. 474, 476 n. 2 (Bankr. D. Del. 2011)

(overruling an objection for the failure to bring an adversary proceeding where the parties had already had the "full and fair opportunity to be heard" on the issue).

Even if a procedural irregularity occurred by the failure to commence an adversary proceeding, the Appellant was fully aware or should have been aware of the implications of filing a motion for relief of stay for the dairy cattle. In fact, within Sunshine's motion, the Appellant identified and prepared arguments concerning whether Sunshine's agreements with the Debtor would be considered a "true lease" or a security interest. (Mot. for Relief from Stay, DN 22-4, at 3). At that time, Appellant should have been aware that if the Bankruptcy Court decided the agreements were not "true leases," there would be a determination of priority. However, even if the Appellant did not recognize the implications of asserting such argument in a motion, it should have become readily apparent based on Citizens First's pretrial memorandum that disputed both the issue of priority as well as the interest in the post-petition milk.

Finally, Appellant's Counsel fully participated in the hearing that determined the nature of Sunshine's agreement and failed to make any sort of objection to the Bankruptcy Court concerning the hearing or lack of adversary proceeding.[1] In re Mayer, 451 B.R. 702, 707 (E.D. Mich. 2011) ("Ordinarily an appellate court does not give consideration to issues not raised below.") (quoting Hormel v. Helvering, 312 U.S. 552, 556 (1941)). The record demonstrates that Appellant had ample opportunity to examine, research, and brief all of the issues ruled on by the Bankruptcy Court. Therefore, there is no reason to disturb the Bankruptcy Court's determinations on procedural grounds.

[1] Appellant's argument concerning a procedural irregularity did not first appear until its brief filed for this appeal.

**B. Sunshine's Prepetition Agreements**

Appellant contends that the Bankruptcy Court erred in determining that Sunshine's agreements with Debtor were actually security interests and not "true leases." Appellant argues that the Bankruptcy Court's findings of fact were inconsistent with the evidence presented at the hearing and that the Bankruptcy Court misapplied the law to those facts. Appellees believe that the Bankruptcy Court properly applied the law in determining that Sunshine's agreements were security agreements disguised as leases.

Both Appellant and Appellees agree that pursuant to the choice of law clause in the Sunshine's agreements that the controlling statute on this particular issue is A.R.S. § 47-1203 (mirrored by KRS § 355.1-203), which distinguishes a "true lease" from a security interest. While the statute states that "[w]hether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case," A.R.S. § 47-1203(A), it provides five significant indicators of a disguised lease. The relevant section states as follows:

> B. A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
> 1. The original term of the lease is equal to or greater than the remaining economic life of the goods;
>
> 2. The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>
> 3. The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration on compliance with the lease agreement; or
>
> 4. The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration on compliance with the lease agreement.

A.R.S. § 47-1203. The Debtor at the trial level bore the burden of showing that Sunshine's leases were actually security interests. In re Consolidated Energy, Inc., 2007 WL 3046471, *2 (Bankr. E.D. Ky. 2007) ("The burden of demonstrating that an agreement is other than what it purports to be is on party asking the court to characterize the agreement as such."). For the challenger to satisfy this burden, the party must show that "the lease is not terminable by the lessee and one or more of the enumerated conditions is present," and if shown, "then the contract is a *per se* security agreement, and the court's analysis may conclude." In re Phoenix Equipment Co., Inc., 2009 WL 3188684, *7 (Bankr. D. Ariz. 2009).

In characterizing the nature of the agreements, Appellant conceded that "the first part of section B is met, as the Debtor is bound to an obligation for the full term of each lease agreement," but the Appellant argues that none of the four remaining sections apply to Sunshine's agreements. (Appellant's Brief on Appeal, DN 27, at 33). Thus, according to the Appellant, the Debtor failed to meet the second part of the conjunctive requirement under Pheonix for a *per se* security agreement. However, the Bankruptcy Court concluded the Sunshine's agreements constituted *per se* security agreements after finding two-part test satisfied.

Turning to the four sections under A.R.S. § 47-1203(B), only one of those sections is relevant to this case: whether the agreements extended beyond the economic life of the dairy cattle. The parties contest whether Sunshine's 50-month lease extended beyond the economic life of the dairy cattle. To this point, Appellant contends that "a dairy herd, by its nature, is a self-renewing asset with a perpetual economic life." Id. On the other hand, Appellees argue that the culling method utilized by Debtor made it so that the term of the 50-month leases extended

beyond the economic life of the dairy cattle. On this issue, the Bankruptcy Court found as follows:

> The original term of the Lease was for 50 months. Clearly, 50 months is longer than the economic life of the goods. Uncontradicted testimony indicated that a dairy herd is culled annually at an approximate rate of 30 percent. Within three years an entire herd is extremely likely to have been entirely replaced and certainly before the end of 50 months.

(Memorandum-Opinion, DN 1, at 40). The Appellant argues that the Bankruptcy Court erred in this factual determination by not taking into account Mr. Blevins' testimony that approximately 2 to 3 percent of cows are usually culled. However, the Bankruptcy Court had the opportunity to weigh the testimony and assess the credibility of those witnesses, and therefore, there is no reason to believe that this finding of fact is clearly erroneous. Moreover, the Bankruptcy Court's factual determination as to the economic life of the cattle is not only supported by evidence in the record but also by the findings in In re Buehne Farms, Inc., 321 B.R. 329 (Bankr. S.D. Ill. 2005). In Buehne the court similarly concluded that the 20 to 30 percent culling method utilized by the Debtor in that case meant that the average economic life of a dairy cow fell below 50 months. Id. at 242. Based on the finding that the economic life of the dairy cattle fell below the term of the leases, the Bankruptcy Court deemed the agreement a *per se* security agreement. Here, the Court finds no reason to depart from either the factual findings or the conclusions of law of the Bankruptcy Court as to the nature of Sunshine's agreement.

**C. Issues Not Raised in Appellant's Brief**

The Appellant's brief failed to argue the other two substantive holdings by the Bankruptcy Court, including which party had the priority security interest in the dairy cattle and whether Citizen First's security interest encumbered the post-petition milk proceeds. Appellee's

brief essentially reiterates the findings of the Bankruptcy Court and asks to affirm those holdings.

Federal Rule of Appellate Procedure 28 requires appellants to identify and argue in their briefs those issues that they seek the appellate court to review. If a party fails to do so, the appellate court does not have to address those issues. Ahlers v. Schebil, 188 F.3d 365, 374 (6th Cir. 1999) (deeming issues not addressed in appellant's brief waived). However, the Court will briefly address the two remaining issues contained in the Appellee's brief and ruled on by the Bankruptcy Court.

Sunshine contended in its responsive memorandum filed after the hearing on January 22, 2013 that 11 U.S.C 552(a) terminated any interest Citizens Bank had in the post-petition milk proceeds. Section 552(a) acts to extinguish any "property acquired by the estate or by the debtor after the commencement of the case" except interest in "proceeds, products, offspring, or profits" where the security agreement included those interests and the nonbankruptcy law applies. 11 U.S.C. 522(a). In arguing this point, Sunshine relied on In re Lawrence, 41 B.R. 36, 37 (Bankr. D. Minn. 1984), which determined, based on legislative intent, that the Section 552(b) exception was only "intended to cover the situation where a creditor holds a security interest in raw materials, and after the filing of a bankruptcy petition, the debtor changes their form by converting them into inventory." On the other hand, Appellee and the Bankruptcy Court relied on the line of cases that read Section 552(b) to include three basic requirements for the continuation of a pre-petition interest:

> '(a) there must be a pre-petition security agreement, (b) the security agreement by its terms must extend to the debtor's pre-petition property and to proceeds, product, offspring, etc. of such property, and (c) applicable non-bankruptcy law, i.e., state law, must permit the security agreement to extend to such after-acquired proeprty [*sic*].'

In re Wiegmann, 95 B.R. 90, 93 (Bankr. S.D. Ill. 1989) (quoting Smith v. Dairymen, Inc., 790 F.2d 1107 (4th Cir. 1986)). The problem with Lawrence, and why Wiegmann is adopted by the Court, is that the holding would not merely interpret the words of Section 552(b), but it would completely rewrite the section. In other words, if the Section 552(b) exception only meant to cover the very narrow situation where raw materials are converted into inventory, then the statute would not include the words "proceeds, products, offspring, or profits." Thus, the Court chooses, as did the Bankruptcy Court, to follow the textual approach adopted by Wiegman over the legislative interpretation provided by Lawrence.

In this case, Citizen First had a prepetition security agreement that included "farm products." Under KRS 355.9-102(1)(ah), "farm products" includes "[p]roducts in their unmanufactured states."[2] Therefore, under the Wiegmann analysis, Citizens First's prepetition security interest in "farm products" continues to encumber the post-petition milk proceeds. For this reason, the Court affirms the Bankruptcy Court's findings as to the post-petition milk proceeds.

Finally, as to priority between the competing secured parties, Sunshine and Citizens First, KRS § 355.9-322 clearly states that superior priority is given to the first party to file or perfect. Here, Citizens First's UCC-1 financing statement predated Sunshine's UCC-1 filing. Therefore, Citizens First's security interest had priority over Sunshine's lien. The Bankruptcy Court is affirmed on its conclusion as to Citizens First having first priority.

---

[2] The Official Comments to the Uniform Commercial Code classify "pasteurizing milk" as a process that "would *not* constitute manufacturing." U.C.C. § 9-102, official comment 4(a) (emphasis added).

## III. CONCLUSION

For the following reasons, the opinion and order entered by the Honorable Joan A. Lloyd, U.S. Bankruptcy Court Judge for the Western District of Kentucky, ordering that Sunshine had security interests and not true leases, Citizens First had priority over Sunshine's security interests, and that Citizens First's security interest encumbered post-petition milk proceeds is **AFFIRMED**. Additionally, Appellant's motion to amend its designation of the record and statement of the issues is **DENIED** [DN 6] because the Appellant may not supplement the record with material not originally presented to the Bankruptcy Court. In re CPDC, Inc., 337 F.3d 436, 443 (5th Cir. 2003) ("[Rule 8006] does not permit items to be added to the record on appeal to the district court if they were not part of the record before the bankruptcy court.") (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 802 (E.D. Pa. 1986)).

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

September 25, 2013

cc: counsel of record
Hon. Joan A. Lloyd